**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LUELLA C. PEHLKE, individually and as | ) | |
| Special Administrator of the Estate of | ) | |
| FRANK PEHLKE, JR., Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:12-CV-00596 |
| | ) | |
| V. | ) | Honorable Virginia M. Kendall |
| | ) | |
| A. O. SMITH CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

**DEFENDANT CBS CORPORATION'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION *IN LIMINE* TO BAR PLAINTIFF'S EXPERT, KENNETH GARZA**

**MOTION IN LIMINE # 3**

Now comes, Defendant CBS Corporation, a Delaware corporation, f/k/a Viacom Inc., successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation (hereinafter "Westinghouse"), by and through its attorneys, Foley & Mansfield, P.L.L.P., and pursuant to Federal Rule of Evidence 702, respectfully requests that this Court bar Plaintiff's expert witness, Kenneth Garza, from offering opinion testimony in this matter. In support, Westinghouse states as follows:

**INTRODUCTION**

Plaintiff, Luella Pehlke ("Plaintiff"), cannot demonstrate that the opinions of her retained industrial hygienist, Kenneth Garza, meet the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Westinghouse anticipates that Mr. Garza will opine that Decedent, Frank Pehlke ("Decedent"), was occupationally exposed to significant levels of asbestos from work around various products, including switchgear, at Joliet Arsenal. *See* Garza Report, attached as Exhibit A; *see also* Garza

Supplemental Report, attached as Exhibit B. This opinion is not supported by any facts of the case or any accepted scientific methodology. Mr. Garza's opinions are based on the unsubstantiated theories and assumptions that (1) the switchgear at issue included asbestos-containing components; (2) that such components were observed to have deteriorated over time due to operation of the equipment and other factors found in industrial environments other than the Joliet Arsenal; (3) that the same factors causing switchgear deterioration were at work at Joliet Arsenal on similar switchgear allegedly found at the arsenal; (4) that the observed deterioration produced dust particles from internal switchgear components which accumulated in a switchgear metal enclosure, an enclosure ventilated to outside air; (5) that such accumulated dust in the enclosure contained respirable asbestos fiber; and (6) the dust that electricians were observed blowing out of the ventilated switchgear metal enclosures included respirable asbestos fibers originating from deteriorated switchgear internal components.

Mr. Garza's opinions ultimately depend on untested theories and opinions provided by Plaintiff's proffered electrician expert, James Huttner, and Plaintiff's proffered mechanical engineer expert, Samuel Wineman. Neither 'expert' provides any scientific or other evidence supporting their opinions beyond their anecdotal and singular observations of electrical equipment at locations other than the Joliet Arsenal.

Mr. Huttner opines that "[a]bout 50% or more of the [switchgear] units in each bank have deteriorated components after 2-3 years of operation and the amount of deterioration increases each year." Huttner Second Amended Rule 26 Report at 6, attached as Exhibit C. Huttner claims that he has visually observed such deterioration as an electrician and admits he has no other studies or scientific evidence supporting or confirming such observations. *See id.* at 5-6; *see also* Huttner Dep. at 52:8-12 (June 1, 2016), attached as Exhibit D.

Further, Plaintiff, in her 'Switchgear Brief,' described Wineman's opinions as follows:

Plaintiffs' engineering expert Wineman confirms Huttner's observations and opinions. Wineman reports: "The asbestos containing components will break down in time due to the constant flow of electricity through the connectors causing heat. This deterioration will cause some asbestos containing materials to flake off, break, or crumble, into a powdery or dust like material which accumulates on the surfaces of the switchgear and inside the boxes." (Ex 11 at 2.) Wineman's opinion is:  *"It is most likely that the dust which had accumulated inside the switchgear boxes or on the gear before inspection and cleaning of the switchgear contained asbestos from deteriorated components."*

CVLO Plaintiffs' Third Revised Brief Re: Electrical Switchgear Asbestos Exposure, All MDL-875, ECF Doc. # 8847 (May 1, 2013) (emphasis added), attached as Exhibit E.

Even if Huttner's or Wineman's limited, unscientific, first-hand observations of the physical condition of 'switchgear' in settings other than the Joliet Arsenal could be considered switchgear deterioration 'evidence' at Joliet or elsewhere, neither they nor Mr. Garza present scientific or other evidence supporting an opinion that there was respirable asbestos dust left in the switchgear enclosures as a result of the claimed deterioration. This 'asbestos dust from switchgear theory' is the critical hypothesis that makes Huttner, Wineman, and ultimately Garza's testimony purportedly relevant—'deterioration' alone isn't the issue; it is whether that deterioration, if it occurred, produced asbestos dust that entered Decedent's lungs. Without any support for this untested theory, none of their testimony about deterioration is relevant or supportive of an opinion that Decedent's disease resulted from work around Westinghouse switchgear.

Neither Garza, Wineman, nor Huttner have air sampling, materials testing, equipment operating data or other scientific evidence to support their 'asbestos dust from switchgear' theories. Wineman's opinion, relied upon by Garza, that "[i]t is most likely that the dust . . . contained asbestos" alone is insufficient without confirming studies, data or other scientific

support. The hypothesis of asbestos content (or not) of observed dust and the source of such dust is incapable of proof by observation with the human eye or logic alone; it must be (and can be) tested and confirmed. Lacking such support for that theory, Mr. Garza's testimony will <u>not</u> help the trier of fact to understand the evidence or to determine a fact in issue and is therefore inadmissible under FRE 702. As the United States Supreme Court has observed, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Additionally, Mr. Garza made no attempt to quantify Decedent's level of exposure to asbestos and simply assumed that because he was exposed to asbestos at all, this exposure was "significant," which has been rejected numerous times by courts and the scientific community alike. Because Mr. Garza's opinions are unreliable, they will not aid the jury in this case.

## <u>ARGUMENT</u>

### PLAINTIFF CANNOT MEET THE REQUIREMENTS OF RULE 702 OR *DAUBERT* TO DEMONSTRATE THAT MR. GARZA'S TESTIMONY IS ADMISSIBLE IN HER CASE.

Trial judges are the "gatekeepers" regarding admission of expert opinion testimony. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Exclusion of improper expert testimony is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *See* Fed. R. Evid. 104(a); *see also Dhillon v. Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001). Federal Rule of Evidence 702 "imposes a special obligation on the trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589). Plaintiff cannot meet her burden of establishing Mr. Garza's testimony is admissible under these standards. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

In addition to requiring that an expert have the requisite qualifications, Federal Rule of Evidence 702 requires that expert testimony (1) be based on sufficient facts or data, (2) is the product of reliable principles and methods, and (3) that the expert reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. "Even 'a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'" *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir.1999)). Plaintiff must establish that Mr. Garza's testimony is "ground[ed] in the methods and procedures of science," as opposed to his own "subjective belief or unsupported speculation," which she cannot do. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589-90. The district court is tasked with "consider[ing] whether the testimony has been subjected to the scientific method; it must rule out subjective belief or unsupported speculation." *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir. 1994). "A expert must substantiate his opinion; providing only an ultimate conclusion with non analysis is meaningless." *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999).

Mr. Garza employed no methodology and instead based his opinions solely on unsupported assumptions that are not corroborated in any way by the facts of Plaintiff's case and baseless scientific "theories" that have been soundly rejected by courts and the scientific community. As such, Plaintiff cannot demonstrate that Mr. Garza's opinions meet the strict requirements of Rule 702 and *Daubert*, and they should therefore be excluded.

### A. Mr. Garza's opinions are unreliable because they are based on faulty assumptions about switchgear not support from the facts of the case.

Mr. Garza's opinions will not assist a jury because he assumes the very conclusions that Plaintiff must prove in this case. His opinions are based on grand assumptions that (1) the switchgear at issue included asbestos-containing components; (2) that such components were

observed to have deteriorated over time; (3) that the same factors causing switchgear deterioration were at work at Joliet Arsenal on similar switchgear allegedly found there; (4) that the observed deterioration produced dust particles from internal switchgear components which accumulated in a switchgear metal enclosure, an enclosure ventilated to outside air; (5) that such accumulated dust in the enclosure contained respirable asbestos fiber; and (6) the dust that electricians were observed blowing out of the ventilated switchgear metal enclosures included respirable asbestos fibers originating from deteriorated switchgear internal components. While Mr. Garza's report contains a blanket recitation of the materials he reviewed, including Plaintiff's fact witness' depositions and the depositions of Plaintiff's expert, Samuel Wineman, those materials simply do not support the assumptions upon which Mr. Garza bases his opinions. Despite the availability of testing, Mr. Garza did not undertake any testing to determine whether the dust came from the internal components of the switchgear or the outside environment.

Federal Rule of Evidence 702(d) requires that an expert apply his methods **to the specific facts of the case**. Fed. R. Evid. 702(d). An expert's "conclusions must be based on **sufficient facts or data** and must be the product of **reliable principles and methods reliability applied to the facts of the case**." *Thakore v. Universal Mach. Co. of Pottstown, Inc.*, 670 F. Supp. 2d 705, 724 (N.D. Ill. 2009) (emphasis added). As the gatekeeper, the trial court must "rule out" expert opinions based on "subjective belief or unsupported speculation." *Deimer v. Cincinnati Sub-Zero Products, Inc.*, 58 F.3d 341, 344 (7th Cir. 1995). As this district has stated, "[a]n expert opinion cannot be based on facts that are contradicted by undisputed evidence." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 810 (N.D. Ill. 2013). Where the expert makes assumptions that are unsupported by any evidence, that is a basis for exclusion. *See e.g.*, *Elcock v. Kmart corp.*, 233 F.3d 734, 756 (3d Cir. 2000); *see also Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill.

2006) (stating that if there is no factual support for expert's assumptions, the assumptions "are by hypothesis unreliable and inadmissible"). Because there is no factual support for Mr. Garza's assumptions, his opinions are unreliable and inadmissible.[1]

Mr. Garza assumes that all switchgear at Joliet Arsenal contained asbestos, which is not supported by the evidence. For this assumption, Mr. Garza relies on the testimony of another of Plaintiff's experts, Mr. Wineman,[2] who has never been to Decedent's worksite and only testified in general terms that between 1945 and the 1980s, switchgear above 440 volts contained asbestos. Exhibit B at 5 (citing Wineman Dep. at 56:12-19 (April 5, 2013), attached as Exhibit F). Decedent's co-worker, Mr. Scroggins, did not recall switchgear above 440 at Joliet Arsenal, where he worked with Decedent. Specifically, he testified that most of the switchgear he saw there was 440 volts, including Westinghouse switchgear. Scroggins Dep. at 33:10-35:07 (July 9, 2014), attached as Exhibit G. While there may have been other voltages, he only specifically recalled seeing lower voltage switchgear, which was 120, 220 and 440 volts. *Id.* at 33:22-35:07, 80:09-81:18. He did not believe any switchgear was labeled as "high voltage." *Id.* at 21:16-21:18. Further, he did not know what components were in the switchgear and was not sure when the switchgear was installed. *Id.* at 81:20-82:9. Mr. Wineman stated that *if* there was asbestos in the insulation, the dust associated with the switchgear would contain asbestos. Exhibit B at 5 (citing Exhibit F at 58:12-63). Because there is no evidence that Mr. Pehlke was around switchgear above 440 volts, the switchgear he was allegedly around would not have fit

---

[1] Mr. Garza makes no mention of Westinghouse switchgear in the context of Decedent's exposure; he only mentions exposure to General Electric switchgear. *See* Exhibit B at 3. As such, Mr. Garza's report is irrelevant, and therefore inadmissible, as to Westinghouse. *See Master v. Hesston Corp.*, 291 F.3d 985, 991 (7th Cir. 2002).

[2] Westinghouse has moved to exclude Mr. Wineman in a separate motion. Mr. Garza relies on Mr. Wineman's depositions to establish that the products to which Decedent was exposed contained asbestos. Should this Court properly exclude Mr. Wineman's testimony, Mr. Garza's opinions are further undermined by his reliance on Mr. Wineman's flawed opinions. *See Fuesting v. Zimmer, Inc.*, 2010 WL 271728 (7th Cir. 2010) (excluding expert testimony that primarily relied on an excluded expert's opinion).

Wineman's criteria for containing asbestos, and therefore, any dust associated with the switchgear would not have contained asbestos. Even in the face of uncontroverted evidence, Mr. Garza still incorrectly assumes that the dust associated with the switchgear contained asbestos.

Additionally, Mr. Garza assumes the switchgear deteriorate over time and produced dust from the internal components that contained asbestos and that the dust that the electricians blew out of the switchgear came from the internal components of the switchgear and contained asbestos. For this assumption, Mr. Garza primarily relies on the deposition testimony of Decedent's co-worker, Billy Scroggins. *See* Exhibit B at 3-4. Mr. Scroggin's testimony does not support this assumption. Mr. Scroggins testified that he did not know where the dust came from or whether it was from the interior of the switchgear because there was so much dust in the buildings already. Exhibit G at 24:01-25:17. He further testified that dust could have gotten into the switchgear from the outside. *Id.* at 83:16-84:7. He never looked to see if there was dust inside the switchgear because he "had nothing to do with [the switchgear]." *Id.* at 25:19-24. As such, he did not know what the dust was composed of that was flowing out of the switchgear cabinets. *Id.* at 84:11-13. If asbestos was in the dust, he believed it was from the piping that got into the switchgear. *Id.* at 84:19-85:3. Additionally, while another of Plaintiff's experts, James Huttner, stated that he observed deterioration of switchgear, neither Mr. Huttner nor Mr. Wineman provide any scientific or other evidence supporting this opinion beyond their anecdotal and singular observations of electrical equipment at other locations than Joliet Arsenal. *See* Exhibit D at 52:8-12. As such, Mr. Garza's opinions rest on nothing more than unsupported assumptions and untested theories.

One important factor courts consider under *Daubert* in determining whether to exclude expert testimony is whether the theory has been and can be tested. *See Daubert*, 509 U.S. at 595.

Testing *is* available that Mr. Garza could have undertaken to avoid using a faulty assumption, but he simply chose not to do so. William E. Longo, Ph.D., who often testifies for plaintiffs in asbestos cases, has performed a work practice study to test the dust found in Westinghouse panelboards to determine if the dust came from the internal components or the outside environment. *See* Asbestos In Electrical Components, attached as Exhibit H. Mr. Longo highlights the inaccuracies of Mr. Garza's assumption that dust associated with electrical boxes came from the internal components. First, the asbestos-containing molded phenolic resin components traditionally used in the electrical boxes did not have a natural degradation mechanism, and therefore, did not "dust" over time without significant mechanical abrasion. *Id.* at 2. Additionally, during the time asbestos was traditionally used in electrical components, other asbestos-containing products may have been used nearby, which could have contaminated the boxes, as the boxes are not air tight. *Id.* at 2-3. Mr. Longo found even when there were no asbestos-containing parts in the panel, asbestos fibers still migrated from other sources and settled in the box from a fiber drift. *Id.* at 3. Thus, it cannot be assumed that the asbestos contamination came from the components in the box. *Id*. The results of this test demonstrate the inaccuracies in Mr. Garza's assumptions and conclusions. Mr. Garza could have, but did not, conduct any tests to scientifically determine the composition of the dust associated with the switchgear instead of unreliably basing his opinions on unfounded assumptions not supported by the evidence in this case.

Thus, Mr. Garza's opinions are based on assumptions that are wholly unsupported by the evidence in this case.[3] This is assuredly not an accepted approach to any scientific determination

---

[3] Mr. Garza likewise ignored relevant and important testimony regarding the use of respiratory protection. His report states that he found no evidence of the use of respiratory protection, which would reduce asbestos exposure. Exhibit A at p. 5; Exhibit B at 6. To the contrary, Decedent's co-workers, Hershel Sampson, testified that Decedent's

and would only serve to mislead, confuse, and bias the jury. Mr. Garza is not permitted to base his opinion on facts that are contradicted by the undisputed evidence in this case. *See Cage*, 979 F. Supp. 2d at 810. As such, this Court should exclude Mr. Garza's testimony.

> ### B. Mr. Garza's opinions are not reliable because he made no attempt to quantify Decedent's exposure level in any respect.

Mr. Garza's opinions regarding Decedent's exposure are likewise unreliable because he employed no methodology to determine Decedent's exposure level from Westinghouse's switchgear—or from any product, for that matter—and simply assumes that any exposure above ambient background level results in significant exposure.

The World Health Organization, National Academy of Sciences, and various government agencies have adopted a methodology for determining the effects of toxins, which includes an evaluation "**of the concentrations of these chemicals in air breathed by the individual**," that is combined with an evaluation of the necessary dose to produce the adverse effects in order to determine the risk of the individual in developing the disease. *See Mancuso v. Consolidated Edison Co. of New York, Inc.*, 967 F.Supp. 1437, 1445 (S.D.N.Y. 1997) (emphasis added).

Various courts throughout the country have excluded expert testimony in toxic tort cases where the expert did not determine the injured party's exposure level, including this district. The Northern District excluded the plaintiff's industrial hygienist, among other experts, in *Kirk v. Crane Co.*, 76 F. Supp. 3d 747, 752-53 (N.D. Ill. 2014) for failure to determine the plaintiff's actual level of asbestos exposure. The industrial hygienist readily admitted in his deposition that he had not considered the plaintiff's actual exposure level, and the court concluded that this was a "wholesale failure to base their opinions on facts specific to the case." *Id.* at 753-54; *see also*

---

employer warned its employees about working with asbestos, instructed them to use respiratory protection, and made such protection available. Sampson Dep. at 110:24-112:24, 162:2-14 (Sept. 25, 2012), attached as Exhibit K.

*Anderson v. Ford Motor Co.*, 950 F. Supp. 2d 1217 (D. Utah 2013) (expert excluded in asbestos case regarding each and every exposure theory because he failed to examine the plaintiff's actual level of exposure); *see also Mitchell v. Gencorp Inc.*, 165 F.3d 778-779 (10th Cir. 1999) (excluding expert who did not attempt to determine decedent's level of exposure to toxic chemical, stating that at a minimum, the expert "should include a description of the method used to arrive at the level of exposure and scientific data supporting the determination;" opinions were "little more than guesswork"); *see also Mancuso v. Consolidated Edison Co. of New York, Inc.*, 967 F.Supp. at 1449-50 (excluded expert who "made no serious effort" to evaluate the dosage of the toxin the plaintiffs received).

Rule 702(d) specifically requires that an expert base his opinions on the specific facts of a given case, which Mr. Garza did not do. *See* Fed. R. Evid. 702(d). Mr. Garza assumed, without making any attempt to quantify Decedent's alleged exposure, that because Decedent was occupationally exposed asbestos at all, he was therefore exposed to "significant" levels of asbestos from various products, including switchgear. "It makes little sense" that Mr. Garza can consider what products Decedent was exposed to and opine about the level of exposure without undertaking to determine Decedent's actual exposure level. *See Mitchell,* 165 F.3d at 781. His opinions are "little more than guesswork," and must therefore be excluded. *See id.*

His generic report readily admits that exposure studies of the levels of exposure using compressed air to blow out switchgear are unavailable, and therefore, he relied on exposure studies of what he claims is the "similar process of using compressed air to blow out dust in brake repair industry." Garza General Report at 46, attached as Exhibit I. This is not a scientific methodology but is pure speculation from unrelated processes. He provided no evidence that both activities are similar or comparable. Brakes contain different asbestos-containing materials

in different concentrations than switchgear, and brakes wear on a continual basis from friction forces, while switchgear does not. Additionally, this apples to oranges comparison ignores key differences in frequency, proximity, and duration of exposure between auto mechanics, who regularly change brakes, and, in this case, non-electricians, like Mr. Pehlke, who are only occasional bystanders to electricians blowing out switchgear. *See Total Containment, Inc. v. Dayco Prods., Inc.*, No. Civ.A. 1996-CV-6013, 2001 WL 1167506, at *7 (E.D. Pa. Sept. 6, 2001) (rejecting an "apples and oranges" comparison where expert failed to establish similarity of the data he relied on to the facts of the case); *see also Joiner*, 522 U.S. at 144-46 (rejecting study data because the opinions were "connected to existing data only by the *ipse dixit* of the expert").'

Westinghouse's expert, Kyle Dotson, did analyze Mr. Pehlke's specific exposure in relation to Westinghouse switchgear with regard to frequency, duration, and proximity. Even under a "worst-case hypothetical," based on the testimony of Decedent's co-worker, Billy Scroggins, in which Decedent was within 10 feet of electricians blowing out switchgear 2 or 3 times per week with an air hose for 3 minutes, "there is not even speculative evidence that such blowing out activities by others would result in any exposure whatsoever for Mr. Pehlke that might be associated with Westinghouse." Mr. Dotson calculated Decedent's "worst-case" exposure as likely zero, and if it were more than zero, it would not have exceeded the exposure of someone his age from the ambient environment in major U.S. cities. Dotson Supplemental Report at 33, attached as Exhibit J.

As such, Mr. Garza's testimony regarding Decedent's asbestos exposure is not at all reliable because he made no attempt to calculate Decedent's exposure level in any way, and this Court should therefore exclude his testimony as unreliable and misleading.

**C. Mr. Garza's opinion that every exposure above ambient background level was a significant exposure is unreliable because it is based on <u>no</u> scientific methodology and has been soundly rejected by the scientific community, as well as courts throughout the country.**

To cover up the absence of reliable and quantifiable data regarding Decedent's exposure levels, Mr. Garza relied on an unsupported and flawed "theory" that every exposure above ambient background level is a significant exposure. This opinion is not based on actual scientific data but is instead incorrectly based on assumptions, speculation, and extrapolation from known scientific data regarding high levels of exposure to asbestos in the absence of scientific data available for low exposures. *See* Jacqueline Karnell Corn, *Environmental Public Health Policy for Asbestos in Schools: Unintended Consequences*, 17 (2000). This flawed analysis entirely ignores the age-old scientific tenant that the toxicity of a substance is dependent on the dose and the consensus among the scientific community that asbestos-related diseases are "dose responsive." *See* The "Any Exposure" Theory: An Unsound Basis for Asbestos Causation and Expert Testimony, 37 Sw. U. L. Rev. 479, 480 (2008). The dose "the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770 (Tex. 2007); David L. Eaton, Toxicology for Judges and Lawyers, 12 J. L. & Pol'y 5, 11 (2003). There is generally a "threshold" dose, "below which even repeated, long term exposure would not cause an effect in any individual." Behrens, 37 Sw. U. L. Rev. at 483-84. The Federal Judicial Center has recognized dose as a "central tenant of toxicology" B. Goldstein & M.S. Henifin, *Reference Guide on Toxicology*, Reference Manual on Scientific Evidence, Federal Judicial Center, 401 (2d ed. 2000); *see also Borg-Warner Corp.*, 232 S.W.3d at 771 (recognizing that asbestos-related diseases are dose-responsive and rejecting the "each and every exposure" theory).

While the Seventh Circuit has not specifically addressed this issue, the Northern District recently excluded testimony of a plaintiff's industrial hygienist regarding this theory, which was offered by the same plaintiff firm representing Plaintiff in this action. In *Kirk v. Crane Co.*, 76 F. Supp. 3d 747 (N.D. Ill. 2014), the plaintiff offered the unsupported opinions from his experts, including an industrial hygienist, that even a single exposure to asbestos is significant and everything after that contributes as well. *Id.* at 752. The court rejected the experts' opinions as a "wholesale failure to base their opinions on facts specific to the case," which runs afoul of Rule 702(d) (requiring experts to reliably apply principles and methods to the **facts of the case**). *Id.* at 753 They identified no peer-reviewed scientific journal adopting their theory and cited to no medical studies setting forth a known rate of error. *Id.* at 754. "Instead, [the plaintiff's] experts tout the 'Any Exposure' theory with little to no evaluation of the actual facts in this case." *Id.* Numerous other courts have also excluded this testimony.[4]

To cover up his failure to quantify or consider the level of Decedent's exposure, including frequency, duration, and proximity, Mr. Garza simply relied on an unsupported and

---

[4] *Gregg v. V-J Auto Parts, Co.*, 943 A.2d 216, 226-27 (Pa. 2007) ("each and every exposure" theory is a "fiction"); *Betz v. v. Pneumo Abex*, 44 A.3d 27, 30, 57-58 (Pa. 2012) (opinion not based on generally accepted scientific methodology); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 773 (Tex. 2007) (recognizing "threshold" exposure limit for asbestos); *Georgia-Pacific Corp. v. Stephens*, 239 S.W.3d 304, 320-21 (Tex. App. 2007); *Bahnemann v. Allied Signal et al.*, No. AD 03-319 (Pa. Ct. Com. Pl. Aug. 17, 2006); *In re Asbestos Litig., Certain Asbestos Friction Cases Involving Chrysler LLC*, No. 0001 Control #084682 (Pa. Ct. Com. Pl. Sept 24, 2008) (no methodology demonstrated for "every exposure" theory); *Free v. Ametek*, No.:07-2-04091-SEA (Sup. Ct. Wash. Feb. 28, 2008) ("every exposure" theory not generally accepted in any field relevant to the case); *Anderson v. Asbestos Corp., Ltd., et al.*, No. 05-2-04551-5 SEA (Wash. Super. Ct. Oct. 31, 2006) ("any exposure" not generally accepted in the scientific community."); *In re W.R. Grace & Co*., 355 B.R. 462 (Bkrtcy. D. Del. 2006)("each and every exposure" opinion is not sound or reliable); *Anderson v. Ford Motor Co*., 950 F. Supp. 2d 1217, 1225 (D. Utah 2013)( "every exposure" testimony is "at most, scientifically-grounded speculation: an untested and potentially untestable hypothesis."); *Butler v. Union Carbide Corp*., 310 Ga. App. 21, 29, 712 S.E.2d 537, 543 (2011); *Brooks v. Stone Architecture, P.A.*, 934 So.2d 350 (Miss. Ct. App. 2006); *Comardelle v. Pennsylvania General Insurance Company, et al.*, 76 F. Supp. 3d 628 (E.D. Louisiana 2015) ("each and every exposure" theory is unreliable and inadmissible); *In re Toxic Substance Cases*, No. A.D. 03-319, 2006 WL 2404008, at *6-7 (Pa. Com. Pl. Aug. 17, 2006); *Bartel v. John Crane, Inc.*, 316 F. Supp. 2d 603, 611 (N.D. Ohio 2004) ("any exposure" theory is "not supported by the medical literature"); *Smith v. Ford Motor Co.*, No. 2:08-cv-604, 2013 WL 214378 (D. Utah 2013); *Sclafani v. Air and Liquid Systems Corp.*, 2013 WL 2477077, *4 (C.D. Cal. 2013) ("each and every exposure" theory not the product of reliable scientific techniques).

flawed "theory" that each exposure above ambient background level is significant, which is completely contrary to accepted scientific principles and which has been soundly rejected by courts throughout the country, including this district. As Westinghouse's expert, Kyle Dotson, stated in his report,

> Since everyone has some exposure, it is not particularly helpful for industrial hygiene and/or medical experts to only opine <u>if</u> asbestos exposure occurred (i.e., yes or not, at some level above absolute zero). For asbestos, as well as other exposures, it is a fundamental tenet of toxicology that it is not enough to simply identify the presence of an exposure; rather, it is the cumulative quantity of exposure over time or dose that determines the risk."

Exhibit J at 3 (emphasis in original). Mr. Dotson cites scientific articles to back this accepted scientific knowledge. *See id.* at n. 23-24. By ignoring the generally accepted concept of dose, Mr. Garza reduces his analysis to an exposure test, and no matter what exposure is considered in his "model," the result is always the same: the defendant's product produced a "significant" level of airborne asbestos exposure. This is not science but simply a litigation technique. Accordingly, this Court, as the gatekeeper of expert evidence, should shield the jury from hearing Mr. Garza's unsupported, misleading, and speculative opinion testimony at trial.

## <u>CONCLUSION</u>

WHEREFORE, for these reasons and the reasons stated in Westinghouse's Motion to Bar Mr. Garza, Defendant Westinghouse respectfully requests that this Court bar Plaintiff's expert, Mr. Garza, from expressing any opinions in Plaintiff's case and grant such other relief that this Court deems just and proper.

Respectfully submitted,


By: _____ /s/ William C. Foote _____
     William C. Foote      #6199467
     wfoote@foleymansfield.com
     Foley & Mansfield, PLLP
     101 S. Hanley Road, Suite 600
     St. Louis, MO 63105
     Tel: (314) 925-5700
     Fax: (314) 925-5701

     Lawrence D. Wilson
     LDWilson@ewhlaw.com
     Evert Weathersby Houff
     3455 Peachtree Road NE, Suite 1550
     Atlanta, GA 30326
     Tel: (678) 651-1200
     Fax: (678) 651-1201

     Attorneys for Defendant
     **CBS Corporation, a Delaware corporation, f/k/a Viacom, Inc., successor by merger to CBS Corporation, a Pennsylvania, f/k/a Westinghouse Electric Corporation**


## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a copy of the foregoing document was filed electronically with the Clerk of the Court using the CM/ECF system and is available for viewing and downloading from the CM/ECF system. The forgoing documents was served upon all counsel of record via the CM/ECF system on this 1st day of July, 2016.


_____ /s/ William C. Foote _____