## UNITED STATES DISTRICT COURT FOR THE
### Northern District of Illinois
### Eastern Division

| | |
|---|---|
| LUELLA PEHLKE, Individually and as Special Administrator of the Estate of FRANK PEHLKE, Deceased, | |
| Plaintiff, | Case No.: 12−cv−00596 |
| v. | Honorable Virginia M. Kendall |
| CBS Corporation, | |
| Defendant. | |

### Plaintiff's Response to CBS's Daubert Motions In Limine to Preclude and Bar Expert Testimony

Plaintiff responds in opposition to CBS Corporation's ("CBS") *Daubert* motions in limine to preclude testimony of Plaintiff experts James Huttner and Samuel Wineman and bar testimony of Kenneth Garza.[1]  (ECF Docs # 64-69.)   These Plaintiff witnesses are identified by agreement of the parties as the subjects for the Daubert hearings.  Additional responsive information will be provided when the witnesses testify at the hearing.

James Huttner ("Huttner"), Samuel Wineman ("Wineman"), and Kenneth Garza ("Garza") will opine, relying on data and assumptions from lay testimony of Franke Pehlke's ("Pehlke") co-worker Billy Scroggins ("Scroggins"), about asbestos exposure to Westinghouse

---

[1] This Court held that "The parties may file both *in limine* and *Daubert* motions, but are barred from filing such motions if the effect of those motions, if granted, would be case dispositive." (ECF Doc # 55 at 3.)

1

electrical switchgear at the Joliet Arsenal.[2]  Scroggins is a maintenance worker who observed
electricians.   Scroggins testified:

- Large switchgear units at Joliet Arsenal were arranged in banks of multiple switchgear and were enclosed in cabinets when they were in operation.  (Ex.1.)

- The switchgear powered large industrial equipment such as motors and pumps.

- Half of the switchgear at Joliet Arsenal were Westinghouse brand and most were labeled "440 volts."  (Ex.2; Ex.3; Ex.4; Ex.5)

- The switchgear were only opened during maintenance, which was conducted by electricians.  (Scroggins is not an electrician so Plaintiff will call electrician Huttner to testify)

- Pehlke, who worked at the Joliet Arsenal from about 1958 through 1999 as a maintenance worker, worked within 20 feet of switchgear approximately once per week for a couple hours at a time while electricians were working on the switchgear.

- The electricians during maintenance work opened the cabinets and blew out switchgear with compressed air, releasing dust from inside the switchgear.

---

[2] In denying CBS's motion for summary judgment on February 23, 2015 Judge Robreno held:
There is evidence that Decedent was exposed to respirable dust blown out of Westinghouse switchgear during the period of about 1969 to 1980. There is evidence that the switchgear was of the DH or DHP series (because it was connected to motors and large pumps). There is evidence that this switchgear contained asbestos (because the evidence indicates that, until 1977, all DH and DHP series switchgear contained asbestos). (Moreover, there is evidence from expert Wineman that All switchgear in industrial and large commercial settings over 440 volts from 1945 to the early 1980s contained asbestos, and there is testimony from Decedent's co-worker that most of the switchgear was marked as "440 volts.") . . .  Plaintiff has identified sufficient evidence to support a finding of causation with respect to switchgear manufactured by Defendant.
(Ex.14 at 10.)

What Scroggins cannot address and which the experts will cover is the asbestos content of insulation materials in the switchgear, deterioration of the insulation behind the closed doors from normal operation over time, and asbestos content of the resulting dust blown out during the electrician's work. The testimony of the experts is about the insulation materials in switchgear which controlled the higher voltage current needed for large industrial pumps and motors such as those Scroggins describes at the Joliet Arsenal. A single breaker (a light switch is an example of a breaker) within such industrial switchgear weighs hundreds of pounds and requires many pieces of insulation materials. The switchgear requires routine maintenance work which is performed by electricians and supervised by engineers. The maintenance work occurs at intervals ranging from every six to every eighteen months. At voltage ranges above 440 volts, which was required by the large pumps and motors, the insulation was asbestos containing in the time period of Pehlke's exposures.

During the hearings, the experts will show demonstrative photographs and videos of fibers hanging out from insulation materials (separator plates) inside Westinghouse breakers of the voltage and amp range at Joliet Arsenal.[3]  (Ex.9; Ex.10; Ex.11; Ex.12; Ex.13)

**Expert testimony standards**

---

[3] The demonstrative photographs and videos illustrate Plaintiff's experts' testimony.

The separator plate is component of an arc shield. Arc shields are discussed in Huttner's report and photographs are attached as exhibits 6, 7, and 8.

"Expert testimony need only be relevant to evaluating a factual matter in the case. That testimony need not relate directly to the ultimate issue that is to be resolved by the trier of fact." *Smith v. Ford Motor Co.*, 215 F.3d 713, 720 (7th Cir. Ind. 2000).[4]

Plaintiff's experts rely on personal experience for some or all of their opinions. An expert's testimony is not unreliable because it is based on personal experience. Numerous cases hold that expert opinion testimony based solely on a personal experience is sufficient under Rule 702 of the Federal Rules of Evidence and the *Daubert* body of law.[5] No specific credentials are

---

[4] Where the Court of Appeals found the District Court "erred when it determined that because plaintiff's proposed expert testimony would not assist the trier of fact with resolving the ultimate issue in the case it failed <u>Rule 702</u>'s relevancy requirement" based on its determination that "neither [experts'] testimony would be helpful to the jury because neither expert could conclusively determine whether a design or manufacturing defect caused the failure in the steering gearbox." *Smith*, 215 F.3d 713 at 721.

[5] In, *Trustees of Chicago Painters & Decorators Pension, Health & Welfare v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 788 (7th Cir. 2007), the Court of Appeals upheld the District Court's decision to allow a drywall taper to testify as an expert on "the issue of how much can be reasonably expected [of] a drywall taper to do in a day" based on him working "for many years in the industry, directly, himself, taping drywall, and now training for more than 10 years, all the apprentices in the area, including those employed by the defendant himself" over objection. (citations and quotations omitted) The Court held that "[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Id.* at 787-88 (citations and quotations omitted).

In *Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 760 (7th Cir. 2010), the Court of Appeals reviewed de novo testimony of an expert experienced in financial services technology who "was tendered as an expert in 'service levels performance and measurements in the financial services industry as well as the performance of financial technology services agreements' " and "testified that [Appellee] had performed its services in a commercially reasonable manner." In determining the testimony reliable, the Court of Appeals held the "testimony cannot be characterized as mere *ipse dixit*. He did not simply testify that [Appellee]'s performance was commercially reasonable because he said so. Rather, he explained that in the financial sector, as he has seen and experienced it, businesses consider technological innovation satisfactory if it enables them to meet their business financial objective. These explanations were based on

necessary to testify as an expert.[6]  Additionally, persuasive case law holds that experts should be

permitted to testify where the practical experience of the expert did not involve precisely the

same product as is at issue in the case being litigated.[7]

Argument about expert's reliance on allegedly deficient facts is rarely a basis for the

exclusion of the expert's testimony; such matters are properly deemed the subject for cross-

---

[expert]'s experience in the industry, which included managing a fifty-person development team.
*Id.* at 761.  The Court also held  "an expert's testimony is not unreliable simply because it is
founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified
as an expert by knowledge, skill, *experience*, training, or education.'" *Id.* at 761 (quoting Fed. R.
Evid. 702; emphasis added by Seventh Circuit).

[6] *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)
(In affirming the lower court decision, the Court of Appeals found an expert accountant
competent to testify to damages despite having no " degree in economics or statistics or
mathematics or some other 'academic' field that might bear on the calculation of damages"
holding that the "notion that [*Daubert*] requires particular credentials for an expert witness is
radically unsound.  The Federal Rules of Evidence, which *Daubert* interprets rather than
overrides, do not require that expert witnesses be academics or PhDs, or that their testimony be
scientific (natural scientific or social scientific) in character.  Anyone with relevant expertise
enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an
expert witness.")  (citations and quotations omitted).

[7] *McCloud ex rel. Hall v. Goodyear Dunlop Tires N. Am., Ltd.*, 479 F. Supp. 2d 882, 887-90
(C.D. Ill. 2007)  (permitting an expert on rubber polymers and tire mechanics to opine on
motorcycle tires despite his lack of specific experience with motorcycle tires, reasoning that "the
problem with Defendant's argument [that the expert was unqualified due to lack of experience
with motorcycle tires] is that the Defendant does not identify any relevant differences between
motorcycle and passenger vehicle tires that might render [the expert] unqualified to give his
expert opinions in the instant matter").

*Latham v. Edelbrock Corp.*, Civil No. 07-713-GPM, 2009 U.S. Dist. LEXIS 89285, at *3 (S.D.
Ill. Sept. 26, 2009) ("Whether or not [the expert] has specific experience with the subject of
warnings as to [the specific product] goes, of course, to the weight and not the admissibility of
his testimony. *See, e.g., Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 81-82 (2d Cir. 1997) (an
expert is not precluded from testifying merely because he or she does not possess experience
tailored to the precise product or process that is the subject matter of a case, provided that the
expert is testifying within the general area of his or her expertise).").

examination of the expert.[8]  If no on point studies exist, Circuit case law allows "extrapolation" from existing data by experts.[9]

"It is not the trial judge's job to determine whether the expert's opinion is correct." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 410 (7th Cir. Ind. 2014) (Where the Court of Appeals overruled the magistrate judge's decision striking expert testimony as irrelevant based on the magistrate's view that the expert's opinion did not fit with the lay witness testimony).

### Basis of Huttner, Wineman, and Garza testimony

*James Huttner*

Huttner is a retired union electrician who spent 34 years in the field.  Huttner's work included installing and maintaining switchgear in industrial and large commercial settings which have the same types of large motors, pumps, and other equipment as at the Joliet Arsenal.  His

---

[8]  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

*Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 807 (7th Cir. Wis. 2013) ("We recently highlighted this distinction in *Stollings*, where we held the district court's exclusion of expert opinion to be an abuse of discretion. There, as here, the district judge had agreed that the expert correctly employed a valid methodology but found the expert's opinion unreliable only because he concluded that one of the key data inputs he used was not sufficiently reliable. In reversing the exclusion of the expert, we noted that even though the data input in question was undoubtedly a rough estimate, [t]he judge should have let the jury determine how the uncertainty about [the accuracy of the data input] affected the weight of [the expert's] testimony.") (citations and quotations omitted).

[9] *Manpower,* 732 F.3d 796 at 806.  ("Trained experts commonly extrapolate from existing data. The critical inquiry is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data only by the *ipse dixit* of the expert, that is properly excluded under Rule 702.")  (citations and quotations omitted).

testimony is based on his personal experience specific to maintaining and observing switchgear insulation in such settings, which includes his observation of the deterioration of separator plates, bakelite boards and other insulation materials (which are listed in his report) in industrial switchgear. His testimony is about any brand or model of switchgear using those insulation materials. Huttner will utilize demonstrative photos and videos during his testimony.

*Samuel Wineman*

Wineman holds a B.S. degree in Mechanical Engineering and is a member of the American Society of Mechanical Engineers. He has worked as a mechanical engineer since 1956 with design and construction supervision responsibilities. His experience lies in project design engineering which includes selection of equipment and materials.[10] Wineman served as the lead project designer for construction of entire powerhouses and other large industrial projects which required selecting switchgear to operate the types of large motors and pumps at Joliet Arsenal. He has personal experience with the design of the electrical systems and equipment that operate large pumps and motors in an industrial setting.

Wineman performed construction engineering work as a draftsmen designer in which he reviewed shop sheet drawings of switchgear proposed by Westinghouse to ensure they met government specifications. (Ex.16 at 13, 16.) The shop sheets listed the ingredients such as asbestos in the switchgear insulation. During the course of his career, Wineman coordinated

---

[10] Mechanical engineering is a separate field from electrical engineering. (Ex.15 at 22-23.) Wineman is an expert in mechanical engineering and bases his opinions in part on that expertise. (Ex.15 at 23.) Mr. Wineman need not be an expert in electrical engineering to provide expert testimony.

with electrical engineers about the necessary capabilities of switchgear to ensure they would work properly with the large pumps which also required use of Westinghouse design drawings. (Ex.16 at 26-27.) He consulted directly with technical manufacturer's representatives from Westinghouse during the design and installation process involving switchgear in the range of 440 volts and above. (Ex.16 at 38-20.) Westinghouse engineers told Wineman that asbestos was used in switchgear insulation materials during presentations about their product. (Ex.16 at 54-55.)

_Ken Garza_

Garza is a certified industrial hygienist who has over thirteen years of experience in the environmental industry. Garza has specific asbestos expertise in assessment and evaluation of asbestos exposure in industrial settings. He has conducted and managed numerous inspections for the determination of asbestos-containing materials and developed abatement protocols for the removal of asbestos-containing materials. Ken Garza has read the available studies about switchgear and relies on asbestos brake studies for his opinions through analogy and extrapolation – a methodology commonly used by industrial hygienists. As is true for most of the thousands of asbestos containing materials, there are only a limited number of studies on switchgear available. These studies are not "on point." Manufacturers such as CBS/Westinghouse and other companies in industries which utilize the higher voltage switchgear provide no data and scientific studies do not measure switchgear insulation deterioration during normal operations or the amounts of asbestos fibers in the dust when switchgear is blown out and cleaned for maintenance. Plaintiff's expert testimony is needed to

fill this void. Some of the data and assumptions Garza relies on are from the experience of Huttner and Wineman as reflected in their reports.

## Response to CBS's arguments

*Huttner and Wineman - Studies and Standards*

CBS argues that Plaintiff's experts' testimony should be excluded because they relied on their experience rather than studies and standards.[11] This is not the standard for exclusion of expert testimony under *Daubert*. Fed. R. Evid. 703 expressly allows reliance on what an expert "personally observed." Fed. R. Evid. 702 permits an expert to be qualified based on "experience" or "training."

*Huttner and Wineman - Personal Experience Opinions and Qualifications*

CBS argues that "Mr. Huttner continues offering unfounded opinions in the field of material science." (ECF Doc #67 at 4.) Huttner has sufficient personal experience to testify under *Trustees of Chicago Painters & Decorators Pension, Health & Welfare* and *Metavante Corp.* because he has seen and experienced the deterioration of component switchgear parts and

---

[11] CBS asserts:
- **"**Mr. Huttner's opinions should be excluded because they are not based on reliable, Scientific methods or studies." (ECF Doc #67 at 6.) His opinions are "based *exclusively* on his subjective observations." *Id.*
- Inasmuch as Mr. Wineman's conclusions and opinions are based on unfounded assumptions and not based on the available, scientific testing methods of conclusively determining dust content and origin, his opinions should be excluded. (ECF Doc #69 at 10.)

the operation of switchgear through his extensive career as an electrician. Huttner will explain his experience at the hearing.

CBS also argues Wineman's opinion based on experience that "all switchgear installed in commercial and industrial applications [above 440 volts] contained asbestos before 1980" should be excluded. (ECF #69 at 12.) Just as with Huttner, Wineman has sufficient personal experience to testify. As to any inconsistency CBS alleges in Wineman's testimony, those questions can be resolved on cross-examination. Wineman will explain his experience at the hearing.

Wineman is qualified to testify, contrary to CBS's argument. (ECF Doc #69 at 5-8.) Wineman need not be an expert in electrical engineering, specific components, and specific products to testify based on his experience in the design and construction of switchgear in industrial settings.

*Garza - Reliance on Comparable Studies*

Garza acknowledged that there are no detailed studies on switchgear deterioration during normal operations and resulting exposure during maintenance.[12] Garza accordingly based his switchgear opinions in part on studies of asbestos exposure during brake repairs. CBS contends Garza's opinions are "unreliable because he employed no methodology to determine Decedent's exposure level from Westinghouse's switchgear." CBS argues Garza cannot rely on studies regarding brake repair to establish asbestos exposure from switchgear (ECF Doc #65 at 11-12.)

---

[12] CBS referenced a newly disclosed work practice study prepared by William Longo after the close of discovery in the *Pehlke* case in their briefing. (ECF Doc #65 at 9; ECF Doc #69 at 8.) The study doesn't concern equipment that has asbestos containing insulation components.

CBS offers only the assertion of its counsel that brake repair exposure is not equivalent to switchgear exposure. CBS offers no industrial hygienist or other expert on this point. Garza will attest at the hearing to the validity of this methodology, and explains it is the exposure to the asbestos dust rather than the mechanism whereby the dust is created that makes the use of brake studies proper. Based on *Manpower, Garza*'s opinions based on extrapolation from comparable exposures are admissible based on the scientific methodology of industrial hygiene even though there is no specific study of asbestos exposure from switchgear.

*Huttner, Wineman, and Garza – Data and Assumptions*

The testimony of Plaintiff's experts relies on data and assumptions (e.g. points mentioned above from the deposition of coworker Scroggins) that Judge Robreno found "support a finding of causation with respect to switchgear manufactured by Defendant." Plaintiff's experts are not relying on "facts that are contradicted by the undisputed evidence in the case" as CBS asserts.

CBS argues that Wineman "hasn't even been provided the facts or testimony that directly address the issues for which he is asked to provide opinions" so his opinions should be excluded and generally attack the data and assumptions he relies on. (ECF #69 at 2-3, 11.) CBS also argues that "Garza's opinions are based on assumptions that are wholly unsupported by the evidence in the case" and should this be excluded. (ECF Doc #65 at 9.) CBS also questions many of the assumptions and data that Huttner relies on throughout their brief. (ECF #67 at 4-5, 8-10.) The experts can properly rely on data and assumptions which Judge Robreno found supported by the evidence in denying summary judgment. The expert testimony standards discussed above, including *Daubert* and *Manpower*, make clear that the data and assumption the expert relies on are a subject for cross-examination.

11

*Huttner and Wineman - Probative v. prejudicial*

CBS argues Mr. Huttner's and Mr. Wineman's "opinions should be excluded because any probative value – of which there is *none* - would be substantially outweighed by the danger of unfair prejudice and confusion of the jury."  (ECF Doc #67 at 10; ECF Doc #69 at 13.)  As noted above, the probative value of the experts is because the coworker is not an electrical maintenance, switchgear construction, or industrial hygiene exposure expert.  CBS states that the "'asbestos dust from switchgear theory" and "the dust had asbestos from deteriorated parts theory" have "no nexus to the determinative issue in this case- whether respirable dust from inside switchgear made its way into Mr. Pehlke's lungs."  Huttner's and Wineman's testimony meets the *Smith* standard of being "relevant to evaluating a factual matter in the case" even if it is arguably unrelated "directly to the ultimate issue that is to be resolved by the trier of fact."

*Garza's - Every Exposure Theory*

CBS argues, based on decisions excluding causation opinions of medical doctors, that "Mr. Garza relied on an unsupported and flawed 'theory' that every exposure above ambient background level is a significant exposure."  (ECF Doc #65 at 13.)  Garza is not testifying to medical causation.  Garza will testify at trial, and explain at the hearing, that the goal of industrial hygiene is to ensure worker safety by eliminating all exposure.  In the field of industrial hygiene, every exposure above ambient background level is significant because they should all be eliminated.

**Conclusion**

For the reasons above, this Court should deny CBS's *Daubert* motions in limine.


Dated: July 22, 2016

 _/s/ Daniel B. Hausman_____
Attorney for Plaintiff

Daniel B. Hausman
Robert G. McCoy
Cascino Vaughan Law Offices, Ltd.
220 South Ashland Ave.
Chicago, IL 60607
(312) 944-0600
(312) 944-1870 (fax)
dhausman@cvlo.com

**Certificate of Service**

I hereby certify that on July 22, 2016, I caused the forgoing to be electronically filed with the United States District Court for the Northern District of Illinois using the CM/ECF system which will automatically send all necessary notifications of this filing to CM/ECF participants in this case.

Dated: July 22, 2016

 _/s/ Daniel B. Hausman_____
Attorney for Plaintiff

Daniel B. Hausman
Cascino Vaughan Law Offices, Ltd.
220 South Ashland Ave.
Chicago, IL 60607
(312) 944-0600
(312) 944-1870 (fax)
dhausman@cvlo.com